(April 23, 1912.)

NETTIE F. HAMILTON, Respondent, v. W. S. HAMILTON, Appellant.

[123 Pac. 630.]

DEFAULT—POWER OF COURT IN RULING ON SAME—EVIDENCE.

(Syllabus by the court.)

1.  An application to open a default is addressed to the sound legal discretion of the court, and the order of the court will not be reversed on appeal unless it clearly .appears that the court abused its discretion, and in determining the question of discretion the power of the court should be freely and liberally exercised under the statute to control and direct its proceedings so as to dispose of cases upon their substantial merits.

2.  The discretionary power of the trial judge upon an application to open a default means a sound and impartial discretion and should be resolved, in case of doubt, in favor of the application.

3.  Affidavits filed on motion to open default in this case examined, and *held* that the trial judge did not err in refusing to open a default judgment upon the showing made in said affidavits.

APPEAL from the District Court of the Second Judicial District for Idaho County. Hon. Edgar C. Steele, Judge.

An action to open a default and set aside a judgment. Motion overruled. *Affirmed.*

W. H. Casady, and E. M. Griffith, for Appellant.

The discretion spoken of in the statute is a legal discretion and not a mere arbitrary one. (*Bailey v. Taaffe,* 29 Cal. 426.)

Defaults are looked upon with disfavor by the courts, and if there is a reasonable doubt as to the sufficiency of the showing of a defendant on motion to open a default, that doubt should be resolved in favor of the application. (*Lybecker v. Murray,* 58 Cal. 189; *Holzeman v. Henneberry,* 11 Ida. 428, 83 Pac. 497.)

Where the circumstances lead the court to hesitate as to the merits of the application, an order denying such a motion will be reversed on appeal. (*Vermont Marble Co. v. Black* (Cal.), 38 Pac. 512; *Pearson v. Drobaz Fishing Co.,* 99 Cal. 425, 34 Pac. 76; *Utah Com. Sav. Bank v. Trumbo,* 17 Utah, 198, 53 Pac. 1033–1036; *Watson v. S. F. & H. B. R. Co.,* 41 Cal. 17.)

The same rule applies to divorce cases as to other cases for opening defaults, and the fact that the plaintiff has remarried immediately after the judgment is no ground for refusing to set it aside. (*Simpkins v. Simpkins,* 14 Mont. 386, 43 Am. St. 641, 36 Pac. 759; *Medina v. Medina,* 22 Colo. 146, 43 Pac. 1001.)

Where there was an agreement between the parties that the case should be continued . . . . or a promise of plaintiff that she would not press the case to judgment, in violation of which plaintiff, without notice to defendant, enters a default, or secures a judgment against the latter in his absence, it is good grounds to vacate the judgment. (23 Cyc. 920, and authorities cited.)

Neglect occasioned by a reliance of defendant upon assurance given him by the plaintiff, or those upon whom he had a right to depend, that it would not be necessary for him to take an active part in the case, or that the suit would not be prosecuted, is sufficient to warrant the court in setting aside the default and judgment. (23 Cyc. 935; *Craig v. San Bernardino Inv. Co.,* 101 Cal. 122, 35 Pac. 558; *City Block Co. v. App,* 4 Colo. App. 350, 35 Pac. 985; *Cadwallader v. McClay,* 37 Neb. 359, 40 Am. St. 496, 55 N. W. 1054; *Henderson v. Lang,* 71 Minn. 468, 74 N. W. 173; *Thompson v. Connell,* 31 Or. 231, 65 Am. St. 818, 48 Pac. 467.)

W. N. Scales, for Respondent.

The application to vacate and set aside the default entered by the clerk and also the judgment entered thereafter was within the sound legal discretion of the trial court, and unless it is shown that there has been an unwarranted exercise of

that discretion, this court will not disturb the order and judgment. (*Baker v. Knott*, 3 Ida. 700, 702, 703, 35 Pac. 176; *Western Loan & Trust Co. v. Smith*, 12 Ida. 94, 85 Pac. 1084; *Pease v. County of Kootenai*, 7 Ida. 731, 65 Pac. 432; *Holland Bank v. Lieuallen*, 6 Ida. 127, 53 Pac. 398; *Holzeman v. Henneberry*, 11 Ida. 428, 83 Pac. 497; *Culver v. Mountain Home Electric Co.*, 17 Ida. 669, 107 Pac. 65.)

STEWART, C. J.—The respondent commenced an action in the district court of Idaho county against the appellant for a divorce and also to have certain real property assigned and adjudged to her as her sole and separate property and also certain personal property, all of which was alleged to be property accumulated during the marriage relation, and for the custody of her three children, the issue of such marriage, aged respectively, sixteen, nine and three years—two sons and one daughter. The ground alleged was adultery with one May Ann Dyer.

The complaint was filed on January 6, 1911. Summons issued upon that day and return made showing that service of the summons and complaint was made on the defendant in Nez Perce county on the 13th day of April, 1911. On May 25, 1911, the default of the defendant was entered and the cause was tried to the court upon the evidence of the plaintiff, Nettie F. Hamilton, and May M. Dyer. The court found that the defendant was duly served with summons and failed to appear, and a decree of divorce was granted and the property described in the complaint was awarded to the plaintiff as her sole and separate property and also the custody of the three children.

On September 3, 1911, the defendant caused to be served upon the plaintiff a notice that on the 9th day of September, 1911, the defendant would move the court to vacate and set aside the decree of divorce and open the default; and that leave be given the defendant to file his answer to the complaint upon the grounds that such judgment and decree were rendered by reason of his mistake, inadvertence, surprise and excusable neglect, and that said motion would be

made upon the records and files in said cause and upon the affidavit of William S. Hamilton.

In opposition to the granting of said application, the plaintiff appeared and filed two counter-affidavits, one made by the plaintiff and the other by Edgar Snowman, to whom the plaintiff had been married subsequent to the granting of said divorce. The defendant also filed affidavits by Clay McNamee and L. W. Clark, and at the hearing presented his answer and cross-complaint and asked leave to file the same.

On September 20th the motion to open the default was presented and by stipulation ten days were given to file affidavits in reply to the affidavits of Clark and McNamee, and on October 10, 1911, the court made an order denying said motion. From this order this appeal was taken.

The only question presented on appeal is, Did the trial court err in denying the motion to set aside the default? It appears from an examination of the answer tendered that such answer is sufficient as an affidavit of merits and shows a defense to the plaintiff's cause of action, and the cross-complaint states facts which show a sufficient cause of action for divorce by the defendant against the plaintiff.

The appellant in his affidavit, among other things, alleges that May M. Dyer, a sister of the plaintiff, came to the home of affiant about four years prior to the making of the affidavit, and has ever since resided in that neighborhood, part of the time at the home of affiant and part of the time at the home of another sister, the wife of one J. W. Parker; that in the year 1910 the said May M. Dyer became pregnant; that at said time she was at the home of said J. W. Parker; that one Edgar Snowman, a widower, lived on an adjoining ranch to that of affiant, whose home was about one-half mile distant from affiant; that Snowman for several years, and especially the year 1910, was a frequent visitor at the home of affiant, and, as affiant believes, was unduly intimate and free with affiant's wife; that a stranger came to affiant at night and after dark and stated that he came to warn affiant to get out of the country at once, as said stranger had heard that Parker and another neighbor threatened that they were going

to get up a vigilance committee to deal with affiant for the rape of, or adultery with, May M. Dyer, and for slander, if the affiant did not get out of that country; that affiant told the plaintiff, and then she told affiant she knew of such threats, and that Parker accused affiant of being the father of said child and the cause of her sister's trouble, and that Parker threatened to have affiant arrested and prosecuted criminally for adultery or rape, and that Parker was threatening to bring suit against affiant for a large sum of money for libel and slander, and that plaintiff began immediately to urge affiant to turn over to her all his property to save the same from being squandered and wasted in litigation, and begged affiant to turn over his property and go away to some other state until said troubles were settled, and that this coaxing and pleading were kept up until about the 21st or 22d of December, when affiant left his home and went to Dayton, Washington, returning on or about the 29th day of December, and found his wife away from home at the home of a neighbor, and she refused to return home with affiant; that he was harassed and annoyed and worried and almost driven to insanity and attempted to commit suicide; that afterward plaintiff returned to her home and immediately renewed her pleadings and coaxing and crying, and then told affiant that Parker insisted that she bring suit for divorce against affiant or that said Parker would prosecute said suits both civil and criminal; and that she had been and consulted counsel while affiant was away, and that her attorney had advised her that she could bring suit for divorce, but that it would not be necessary to prosecute the same, but that she could let it lie over and be continued from term to term until the trouble blew over or she could sell or dispose of the property and then suit could be dismissed; and then she told affiant that she did not want a divorce, but that Parker insisted that she must bring such suit or he would prosecute his said suits; and that during all of such times the plaintiff harassed and annoyed affiant and coaxed and begged and pleaded with him that he turn over his property, and that if he refused to comply with her request and plan that Parker would go ahead

with his suits; that on the 4th day of January, 1911, Snowman came to the house of affiant and urged affiant to comply with the plaintiff's request, and that it would be best for the affiant and his family to comply with the same, and gave other reasons why it would be best; and that on the 1st day of January, 1911, the plaintiff again urged that the defendant comply with her request to save their property, and again told affiant that she did not want a divorce, but that she would have to file such suit, but that she would not prosecute the same, but would let the same lie over, and have it continued from term to term until the trouble was disposed of; that he relied upon these statements and representations and the promises of the plaintiff, and because of her said acts and conduct, and because of the threats made and his desperation and that he believed that his wife had no purpose in her request except as thus expressed, and that he agreed to comply with her said request and to turn over to her all the property and go away from the state until the trouble blew over; that on the 5th day of January, 1911, the plaintiff started to Grangeville to institute an action for divorce and affiant left his home on the following morning for Lewiston to execute the necessary papers to turn over his said property pursuant to his agreement with his wife; that on the 9th day of January, 1911, he made and executed a deed to his wife for all his property, consisting of 200 acres of land and a bill of sale of personal property, all of the value of $10,000, and thereafter went to Dayton, in the state of Washington; that he knew nothing about the prosecution of plaintiff's suit for divorce or that the same was being prosecuted or that a decree of divorce had been granted therein until on or about the 29th day of July, 1911, when he was told that his wife had procured a decree of divorce and had gotten all his property and the custody of the children, and was remarried to Edgar Snowman and was living with Snowman in affiant's home; that the summons in the action was served on affiant by the sheriff of Nez Perce county, but that affiant made no appearance for the reasons above given and for the reason that he relied upon the statements and representations of his wife

that it was not to be prosecuted; that he did not want a divorce; that affiant's failure to appear in said action and file an answer thereto was due to the false representations of his wife, the said plaintiff, and that the decree of divorce was rendered against him through his mistake, inadvertence, surprise, and excusable neglect; that he is informed and believes that the filing of said suit and the threatened suits of Parker were the result of a conspiracy between the plaintiff and Snowden and Parker for the purpose of charging the affiant with adultery and to threaten affiant with suits by Parker, and that the stranger was sent by them to threaten affiant and in order to intimidate him into turning over his property and leaving the country; that the plaintiff and Edgar Snowman procured a license upon false affidavits in said Idaho county and were married as husband and wife on the 4th day of June, 1911, and also thereafter in June, 1911, said parties procured a license at Asotin in the state of Washington and were again married as husband and wife.

In the counter-affidavit filed on behalf of the plaintiff in opposition to the motion to open the default, the plaintiff alleges that in the year 1910 May M. Dyer became pregnant; that at such time she was unmarried; that she is the sister of the affiant, and also a sister of Carrie Parker, the wife of J. W. Parker; that at such time said May M. Dyer lived with affiant and her husband and also at times with the family of J. W. Parker; that May M. Dyer had informed her of her condition and the cause of the same, and the defendant's relations with her; that she knows nothing about a stranger visiting the defendant or what he told the defendant except what the defendant told affiant, and that she did not conspire with any person to send such person to defendant; that she did not at any time urge the defendant to turn over his property for any purpose or cried or begged the defendant or made any threats or statements or expressed any desire to have the defendant turn over his said property; that affiant told the defendant that if he was not guilty as charged by May M. Dyer, he should stay and fight the matter out and vindicate his character; that about December, 1910, defendant

went to Dayton, Washington, to attend a family reunion at the home of his mother, and when he returned she was at her own home with her children; that prior to that time he left for a day or two and then he returned and found the affiant at the home of H. C. Johnson; that she did refuse to return home as she was satisfied of his guilt; but she never told the defendant that she must bring a suit for divorce against him or that J. W. Parker would prosecute a suit against him, either civil or criminal; that she did go and see an attorney about getting a divorce; but did not tell the defendant that it would not be necessary to prosecute the same, or that she would let it lie over and be continued from term to term until the trouble blew over, or that she could sell and dispose of the property and then the suit could be dismissed; nor did she tell him that she did not want any divorce or that Parker insisted on her bringing such suit and in case she did not he would prosecute his suit against the defendant; nor did she at any time try to persuade him to turn over said property to affiant or coax him to do so or threaten him with prosecution or make any promises concerning the divorce, except that she told him that she was going to get a divorce, that she would not live with him after he had been untrue to her, his family, and his marriage vows; that she never made any promises nor held out any inducements to the defendant concerning the divorce, and that the defendant had full information that the same was brought and would be prosecuted; that no other person, so far as she knows, ever entered into any conspiracy to charge the defendant with adultery or any other crime, or to threaten him, or to send a stranger to him, or to intimidate him, or to cause him to leave the state or wreck his home or for any purpose whatever; that the home of affiant and the defendant was wrecked and broken by the voluntary acts of the defendant and for no other reason; that the affiant intermarried after her divorce with one Edgar Snowman; that at the time she married she did not know that the laws of Idaho prevented the same, and as soon as she found that the required time had not elapsed after procuring her divorce she went into the state of Washington and remarried, and that

there was no arrangement of any kind or character between the affiant and Snowman until after the divorce was granted, and that there was no suggestion either between the affiant or Snowman nor was there any talk until after the divorce was granted; that the affiant and Snowman are living as husband and wife and not in defiance of law, but under a license of marriage duly issued in the state of Washington, and under a marriage duly performed.

Plaintiff also filed an affidavit of Edgar Snowman in corroboration of her own affidavit, in which the affiant in substance states that he had known both plaintiff and defendant for a long time, and has been their neighbor; that until after the divorce of plaintiff he had no thought nor neither did the plaintiff that they should marry, and that the only relations existing between the plaintiff and affiant were those of ordinary neighborhood friendship, and that affiant at no time attempted individually or in connection with others in any manner at all to persuade the defendant to turn over his property or to leave the state; that at the time plaintiff and said Snowman were married they believed they had a right to do so and obtained a license and had a marriage ceremony performed, and afterward learned that a marriage could not be solemnized until six months after a divorce was granted, and thereafter went into the state of Washington and were duly married upon proper license; and in a general way denies the other allegations of the defendant's affidavit.

The defendant also filed an affidavit of Clay McNamee who alleges that on the 9th day of January, 1911, the defendant consulted the affiant concerning a certain purported criminal charge of rape alleged to have been committed on a sister in law residing near Kamiah, Idaho, during the year 1910, and about his property rights as between him and his wife; and that after such consultation he again returned to affiant's office on said day and requested the affiant to draw a deed to all of the community real estate owned by him and his wife to his wife, and that affiant protested and remonstrated with the defendant against such a course, advising him that if he did so, if his wife desired to take advantage of such

transfer she could job him out of all his property, and that the defendant then stated that the transfer was being made for the benefit of his minor children and that he had perfect and absolute confidence in his wife, and insisted on the deed being made, which was accordingly done.

An affidavit was also filed on behalf of the defendant by one L. W. Clark, which in substance states that on or about the 10th day of January, 1911, affiant took the deed and bill of sale mentioned in the affidavit of W. S. Hamilton and delivered the same to the said Nettie F. Hamilton, and the plaintiff then told affiant that she had persuaded the defendant to transfer and turn over to her the defendant's property so that she could sell and dispose of the same, which she intended to do as soon as she could, and that she would then go to the defendant, her then husband, and that she had filed a suit for divorce, but that she did not want a divorce, and did not intend to prosecute said suit; that her attorney had told her that she could file said suit, but that it would not be necessary to prosecute, but that it could lie over and be continued until she could sell and dispose of her said property and that the same could be dismissed; that she did not want to start said suit for divorce, but that her brother in law, J. W. Parker, demanded that she start the same or that he would have the said defendant arrested and prosecuted for adultery or rape; and that if she did not bring the suit said Parker told her he would not live with her sister and she had better go to Missouri, and that she told affiant she did not intend to prosecute said suit, and told affiant to tell Will, meaning the defendant, to be a good boy and save his money and everything would come out all right, and that affiant told the defendant within a few days thereafter the foregoing facts and assured him that he need not worry or be uneasy about his suit, that the plaintiff assured affiant that the suit would not be prosecuted and that she did not intend to get a divorce and that said suit was brought to pacify Parker and to prevent trouble and litigation.

There was also filed an affidavit of the plaintiff in which she states that L. W. Clark is an uncle of the defendant Ham-

ilton; that at no time did affiant. and the said L. W. Clark talk about the character of May M. Dyer except until after it had been known that the defendant had been guilty of adultery, and that when said Clark brought the deed from defendant to plaintiff it was discussed, and the plaintiff never told Clark that she had persuaded the defendant to transfer or turn over to her defendant's property, or that she could sell or dispose of the same or otherwise, or that she intended so to do, but on the contrary, at the time mentioned in the affidavit of Clark when the deed was turned over to affiant she told Clark that she never expected to live with the defendant any more; that she did not tell Clark that she did not want a divorce or that she did not intend to prosecute such suit or that her attorney had told her that she could file the suit but need not prosecute the same or she could let it lie over and be continued from term to term; that she did not tell Clark that she did not want to start a suit for divorce; but that her brother in law demanded that she start the same, or that he, Parker, would have the defendant arrested and prosecuted for adultery and would bring suit for damages for a large sum of money against the defendant; that she did not tell Clark that Parker said that if she did not bring the suit he would not live with her sister, or that if she did not bring the suit that Parker told her she had better gô to Missouri; that affiant never in any manner misled the defendant and made no promises to him in any manner in which she was not to get a divorce, but that the defendant knew when the summons and complaint were served upon him in the action that affiant was going to prosecute said divorce suit to a final determination.

Did the trial court err in overruling the application to open the default? In the case of *Pittock v. Buck,* 15 Ida. 47, 96 Pac. 212, this court announced the general rule of law governing such applications: "An application to open a default is addressed to the sound legal discretion of the trial court, and the order of the court will not be reversed on appeal, unless it clearly appears that the court abused its discretion; and in determining the question of discretion,

the power of the court should be freely and liberally exercised, under the statute, to mold and direct its proceedings, so as to dispose of cases upon their substantial merits." (*Holzeman v. Henneberry*, 11 Ida. 428, 83 Pac. 497; *Buell v. Emerich*, 85 Cal. 116, 24 Pac. 644; *Miller v. Carr*, 116 Cal. 378, 58 Am. St. 180, 48 Pac. 324.) In that case it appeared that counsel for the applicant appeared in the district court and asked permission to intervene in the case of *T. Ralph Pittock v. John W. Pittock* before the judgment had been entered in said cause, and understood he was given a fixed time within which intervention could be filed, and that judgment was entered in the case of *Pittock v. Pittock* before the expiration of the time in which the applicant was to have to appear and answer in said cause and such facts were not denied, and this court said: "Under these facts she had a right to rely upon her understanding that no further proceedings would be taken in the action until the time fixed for the application to intervene, and we do not believe that the court would have permitted judgment to be rendered before that date had the court been fully satisfied that she had a right to intervene in said cause." The discretionary power of the trial judge upon an application to open a default has been recognized and approved by this court in a number of cases. (*Holland Bank v. Lieuallen*, 6 Ida. 127, 53 Pac. 398; *Pease v. County of Kootenai*, 7 Ida. 731, 65 Pac. 432; *Holzeman v. Henneberry*, 11 Ida. 428, 83 Pac. 497; *Western Loan & Savings Co. v. Smith*, 12 Ida. 94, 85 Pac. 1084; *Pittock v. Buck*, 15 Ida. 47, 96 Pac. 212; *Culver v. Mountain Home Electric Co.*, 17 Ida. 669, 107 Pac. 65; *Harr v. Kight*, 18 Ida. 53, 108 Pac. 539; *Hall v. Whittier*, 20 Ida. 120, 116 Pac. 1031.) This discretionary power means a sound and impartial discretion and should be resolved in case of doubt in favor of the application. While the application in the Pittock case was based upon the applicant's understanding and agreement as to the time in which appearance should be made, it also appears that such facts were in no way denied. In the case now under consideration, however, the facts stated in the affidavit of the defendant as to the agreement

with the plaintiff as to the bringing of the suit, and that the same would not be prosecuted, and that it would be continued from term to term and finally dismissed after the other troubles had been satisfied, are absolutely and specifically denied by the plaintiff. The defendant is in some respects corroborated by the affidavit of Clark in which he says that the plaintiff told him that she had filed a suit for divorce, but that she did not want a divorce and did not intend to prosecute said suit; that her attorney told her that she could file said suit, but that it would not be prosecuted but it could lie over and be continued until she could sell and dispose of her said property, and that the same could be dismissed; that she did not want to start said suit, but that her brother in law Parker demanded that she start the same, and that she did not intend to prosecute the suit, and told the affiant to tell Will, meaning the defendant, to be a good boy and save his money and everything would be all right. The affidavit of Clark is contradicted by plaintiff specifically, and it is shown that Clark is an uncle of the defendant.

Clay McNamee makes affidavit that the defendant consulted him as an attorney on the 9th day of January, 1911, concerning the charges made against defendant of a criminal nature and the disposition of his property rights as between himself and his wife, and requested Mr. McNamee that he draw a deed to the plaintiff, his wife, for all the community real estate owned by him and his wife, and that Mr. McNamee remonstrated with the defendant against such a course, and that the defendant said *that the transfer was being made for the benefit of his minor children, and that he had perfect and absolute confidence in his wife,* and insisted on the deed being made, which was done accordingly. This in a way corroborates the plaintiff and that defendant was aware that the plaintiff was taking some action against him, and shows a desire on his part to place the title of the property in his wife so that the children might be taken care of, and this is just what the trial court did in the decree of divorce. This act on the part of the defendant was after he and his wife had separated and she had gone to Grangeville to com-

mence an action for divorce, and the defendant had gone to
Lewiston.

Upon this evidence the trial court determined that the
showing was not sufficient to authorize the opening of the de-
fault.   It appears from the nature and character of the affi-
davits as to the merits of the case, and which we have not
set out in full in this opinion because of the vicious charges
made by the plaintiff against the defendant, and made by the
defendant against the plaintiff, charging immorality and
adultery with various parties, and the affidavits themselves
are so general and vicious as to cause anyone to pause and
doubt long before the statements could be accepted as being
truthful.   The record shows that the charge in the complaint
for divorce was adultery; that upon the trial the trial court
heard the evidence given by the plaintiff and also the person
with whom such adultery was alleged to have been committed,
and that the divorce was granted upon such proof, and the
trial court, having read such affidavits on the hearing of the
motion, must have concluded that the mere statements of the
defendant that the charge made in the divorce suit was not
true did not show that the defendant had been denied any
rights which would arise by the trial of the cause upon its
merits.

The defendant was not served with summons in the divorce
action until April 13, 1911, and he then knew that he had
been sued for divorce and that he must answer in the said
cause or else his default would be taken within the time fixed
by law.   This is in accord with what the plaintiff says she
told the defendant at the time they separated.   In the face
of these facts the defendant gave no attention to such suit
until the application to set aside the default was made by the
notice on September 3, 1911.

Upon the affidavits made, it no doubt was a difficult task
for the trial court to determine who had sworn to the truth,
and the trial court, after reading the affidavits and seeing
the parties and also having heard the divorce trial and ob-
served the parties who testified, concluded upon such hearing
to refuse to open the default, and we are not inclined to hold

that the trial court abused its legal discretion. From these affidavits it is apparent that both parties to the suit, as well as a number of other parties, have deliberately violated the penal laws of this state, as well as all rules of common decency and morality, and that immoral and licentious relations have existed between the plaintiff and men not her husband and the defendant and women not his wife, and that immoral and licentious conduct has existed between other parties who are not parties to the suit to such an extent, as disclosed by the affidavits, that the conduct of such parties is beastly and should be fully investigated and the guilty persons brought to trial and punishment, and we direct that a copy of this opinion be transmitted to the prosecuting attorney of Idaho county with directions that the charges made in the affidavits filed in this case be thoroughly investigated and that such procedure be taken as is justified from such investigation.

The order appealed from in this case is *affirmed*. Costs awarded to the respondent.

Sullivan, J., concurs.

Ailshie, J., sat at the hearing but took no part in the consideration of the case.